DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
COLLEEN M. KEATING (Cal. Bar No. 261213)
Email: keatingc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MARC J. FRANKEL,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 214(a) of the

Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because defendant Marc J. Frankel ("Frankel") resides in this district.

## SUMMARY

4. This action concerns Frankel's scheme to defraud his investment advisory clients by stealing and misappropriating their assets to pay his personal expenses and for other unauthorized purposes. In doing so, Frankel breached the fiduciary duty of care and duty of loyalty that he owed his advisory clients and violated the antifraud provisions of the federal securities laws.

5. Frankel's advisory clients included Major League Baseball (MLB) players. As their investment adviser, Frankel had access to his clients' financial information, including their brokerage account and associated checking account numbers. In or about December 2017, Frankel starting using this information to steal and misappropriate money belonging to one of his MLB advisory clients, Advisory Client #1.

6. Specifically, Frankel targeted an account Advisory Client #1 had created in the name of his sole proprietorship and, using the account and routing numbers, started transferring money out of the account to make payments on an American Express ("AMEX") credit card in the name of Frankel's deceased mother. Although Frankel's mother passed away in 2015, Frankel had continued to use her AMEX account for his personal benefit, including paying for Lakers tickets, his children's college tuition, jewelry, electronics and travel.

7. Between approximately December 2017 and June 2020, Frankel transferred money from Advisory Client #1's account to AMEX in order to pay off these and other credit card charges. In total, Frankel made, or caused others to make, 241 unauthorized transfers totaling approximately $739,052 from Advisory Client #1's account to AMEX.

8. Frankel attempted to conceal and obscure the fact that he was stealing and misappropriating money from Advisory Client #1's account by breaking up the unauthorized transfers to AMEX into multiple smaller payments that would appear consistent, in dollar amount, with legitimate payments coming out of the account, which was often used to pay Advisory Client #1's personal assistant and related expenses.

9. Moreover, in May 2020, when others began scrutinizing Advisory Client #1's finances and this checking account, Frankel took additional steps to conceal the unauthorized transfers to AMEX. Frankel falsely claimed to personnel at Advisory Client #1's sports agency that he had already reviewed the account and had found no improprieties. Frankel then stopped using Advisory Client #1's account for the unauthorized transfers and instead targeted one of his other advisory clients, Advisory Client #2, for the scheme. Like Advisory Client #1, Frankel used the financial information he had for Advisory Client #2 as her investment adviser to make two unauthorized payments to his mother's AMEX credit card totaling approximately $4,765.58. Finally, when questioned by Advisory Client #1's agent about the unauthorized transfers, Frankel lied and attempted to place the blame for the AMEX charges on Advisory Client #1's personal assistant.

10. By engaging in this conduct, Frankel violated Sections 206(1) and 206(2) of the Advisers Act. Accordingly, the SEC seeks findings that Frankel committed these violations, permanent injunctions against him, disgorgement with prejudgment interest, and a civil penalty.

## **THE DEFENDANT**

11. Defendant Marc J. Frankel, age 61 and resident of Tarzana, California, is the owner of MJF Advisors, LLC, a financial advisory firm that had an office located in Encino, California. Frankel previously held Series 7 (registered representative), 63 (state) and 66 (investment adviser) licenses.

# THE ALLEGATIONS

**A.   Frankel's Association with a Registered Investment Adviser**

12.   Frankel worked as an investment adviser representative for an investment advisory firm registered with the SEC, whose principal place of business was Santa Barbara, California (the "Firm").

13.   On or about August 31, 2010, Frankel and the Firm entered into an Affiliate Agreement, which included the following terms:

   (a)   The Firm appointed Frankel as an independent contractor and representative to solicit, offer, provide and sell mutually agreed products and services to individuals that Frankel brought to the Firm as clients.

   (b)   Frankel was required to comply with all applicable laws in rendering his services to clients and comply with the Firm's policies and procedures, including those relating to compliance, professionalism and competence.

   (c)   The affiliation agreement between the Firm and Frankel was exclusive in that Frankel was required to provide all of his investment adviser services to clients through the Firm, and that Frankel was not neither separately registered nor acting in a registered capacity or offering services for any other registered investment adviser.

   (d)   Frankel could not offer services to a client until he had received a new account or advisory contract, as well as other documents, approved by the Firm and signed by the client.

   (e)   Frankel could not make, to any third party, any untrue or misleading statements about or relating to the Firm or the products or services he provided to clients on its behalf.

14.   Frankel was associated with the Firm as an investment adviser representative from September 2010 to June 2020.

**B.   Frankel Owed His Firm Clients Fiduciary Duties**

15.   Since 2010 and throughout the relevant period, the Firm was a registered

investment adviser with the SEC.

16. During this same time period, Frankel was an IAR and an investment adviser under Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). That is, he was engaged in the business of providing investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities to his Firm clients. Specifically, Frankel managed his Firm clients' assets on a discretionary basis and made investment decisions on their behalf in exchange for compensation, namely, a percentage of the management fees collected by the Firm.

17. As an investment adviser, Frankel was a fiduciary for his advisory clients. He accordingly owed his clients a duty of loyalty, which includes an affirmative duty of utmost good faith, to provide full and fair disclosure of all material facts and to employ reasonable care to avoid misleading his advisory clients. That duty to disclose all material facts included a duty to tell clients about any actual or potential conflicts of interest that might incline Frankel to give investment advice that was not disinterested. Frankel also owed his clients a separate duty of care. That duty of care included a duty to provide investment advice in the best interest of his clients based on their objectives, a duty to seek best execution when placing client trades with a broker-dealer, and a duty to provide advice and monitoring over the course of the advisory relationship.

18. For example, in its 2017 through 2020 Compliance Manuals ("Firm compliance manual"), the Firm explained that the anti-fraud provisions of the Investment Advisers Act of 1940 and most state laws imposed a duty on investment advisers to act as fiduciaries in dealings with their clients, meaning the adviser must hold the client's interest above his own in all matters.

19. The Firm's compliance manual further emphasized that investment advisers should avoid conflicts of interest, including any activity that acts as a fraud or deceit on clients, charging unreasonable fees or borrowing money from clients.

20. The Firm's 2017 and 2019 Code of Ethics ("Firm code of ethics")

required that Frankel abide by honest and ethical business practices in all conduct, treating his clients fairly and doing what is right, including placing the interest of the client first at all times, including not borrowing money or securities from a client.

21. The Firm's compliance manual and code of ethics in effect during the relevant period applied to Frankel as one of its IARs.

22. Frankel attested in writing, on or about August 24, 2018, February 25, 2019, August 5, 2019 and February 25, 2020, that he had received, read, and complied with the Firm's compliance manual and code of ethics.

C. **Frankel's Misappropriation of Advisory Client Funds**

23. Advisory Client #1 told Frankel that he needed to focus all his attention on his baseball career and was relying on Frankel to manage his assets. Accordingly, Frankel was the only person who made investment decisions on behalf of Advisory Client #1.

24. Frankel made investment decisions for Advisory Client #1 in the brokerage accounts he maintained through the Firm, including buying and selling securities and deciding when to hold those securities, all on a discretionary basis.

25. In addition, Frankel had authority to manage all of the assets in Advisory Client #1's various accounts with the Firm, including transferring funds between those accounts to accomplish Advisory Client #1's investment objectives.

26. On or about November 13, 2012, Advisory Client #1 opened an account ending in x4084 ("the x4084 account") through the Firm under the name of his sole proprietorship and single member limited liability company.

27. While Advisory Client #1 maintained other brokerage accounts at the Firm during the relevant period, the x4084 account had checking capabilities via an attached bank account.

28. Advisory Client #1 primarily used the x4808 account to pay his personal assistant and other related expenses.

29. Under the terms of the investment adviser agreement that Advisory

Client #1 signed with the Firm, Frankel had the discretion, as his investment adviser, to manage the x4084 account in a manner he deemed prudent in accomplishing his financial objectives.

30. Frankel did not use the x4084 account for buying or selling securities, but would transfer funds from Advisory Client #1's brokerage accounts that he did use for trading to the x4084 account. As the investment adviser, Frankel had access to the x4084 account information, such as the account number, the name on the account and the routing number of the attached checking account.

31. Advisory Client #1 also authorized the Firm to deduct advisory fees, which was single rate fee arrangement, from the x4084 account.

32. Beginning on or about December 26, 2017 and continuing through on or about May 15, 2020, Frankel began misappropriating funds and violating the fiduciary duties he owed to Advisory Client #1 by transferring money out of the x4084 account for Frankel's personal benefit.

33. Frankel carried out this fraudulent scheme by initiating automated clearing house ("ACH") payments on AMEX's website under his deceased mother's AMEX account. Specifically, Frankel entered the checking account number, the name on the account and the routing number for the x4084 account into the AMEX website to initiate the ACH payments.

34. The AMEX credit card charges that Frankel paid through these unauthorized transfers from the x4084 account were primarily personal expenses and for Frankel's benefit. For example, although the AMEX account was under his deceased mother's name, Frankel had a credit card in his name under this same account and would use it or the AMEX credit card under his deceased mother's name to pay for Lakers tickets, his children's college tuition, jewelry, electronics and travel.

35. In total, Frankel made, or caused others to make, approximately 241 separate unauthorized transfers from the x4084 account totaling approximately $739,052.

36. Frankel's fraud was material because any reasonable advisory client would want to know that their investment adviser had stolen more than $700,000 of their funds.

**D.  Frankel's Misstatements and Attempts to Conceal His Fraudulent Scheme**

37. Although the first unauthorized transfer Frankel initiated on or about December 26, 2017 was for about $11,689.16, he typically transferred between $2,000 and $4,000 at a time out of the x4084 account. Frankel did this to make the unauthorized transfers more in-line with the legitimate expenses paid out of the x4084 account, in an effort to avoid detection of his fraud.

38. In or about May 2020, Advisory Client #1's sports agency noticed suspicious transactions in one of Advisory Client #1's other accounts at the Firm and began scrutinizing all of Advisory Client #1's accounts, including the x4084 account. When Frankel learned of this, he falsely stated to Advisory Client #1's sports agency that he had already reviewed the transactions in the x4084 account and found nothing improper. Frankel made this false statement with the goal of concealing the unauthorized transfers to his deceased mother's AMEX account.

39. A month later, in or about June 2020, Advisory Client #1's sports agency discovered unauthorized ACH transfers in the x4084 account. The sports agency flagged them as potentially fraudulent, and Advisory Client #1's sports agent questioned Frankel about the transfers. Frankel falsely stated that Advisory Client #1's personal assistant had an AMEX credit card and blamed Advisory Client #1's personal assistant for the unauthorized charges.

40. In or about June 2020, Frankel stopped making unauthorized transfers from the x4084 account because Advisory Client #1's sports agency was scrutinizing all of Advisory Client #1's accounts to identify other suspicious activity.

41. In spite of this scrutiny, Frankel did not stop misappropriating advisory client assets. Instead, Frankel defrauded another one of his advisory clients, Advisory Client #2, who also had an account at the Firm that she used primarily for

banking. He began transferring money out of Advisory Client #2's account to pay for the personal expenses he had incurred on his deceased mother's AMEX credit card.

42. In total, Frankel initiated two unauthorized transfers from Advisory Client #2's accounting totaling $4,765.58. Like Advisory Client #1, for each of these unauthorized transfers, Frankel entered the checking account number, the name on the account and the routing number into the AMEX website to initiate the ACH payments.

E. **Frankel's Scienter and Unreasonable Conduct**

43. During all relevant periods, Frankel acted with scienter and with negligence.

44. When misappropriating Advisory Client #1 and Advisory Client #2's funds, Frankel acted intentionally. He knowingly took funds for his own benefit out of client financial accounts that he controlled: to initiate the fraudulent ACH payments, Frankel had to enter his advisory clients' account information when paying his own personal expenses on AMEX's website.

45. Frankel's fraudulent intent is further demonstrated by his later efforts to conceal his misconduct. First, to avoid detection of his fraud, Frankel made structured transfers in smaller amounts when misappropriating Advisory Client #1's funds, so that those unauthorized transfers would be consistent in size with legitimate payments being made out of the account.

46. Second, when Advisory Client #1's sports agency began to scrutinize activity in all of Advisory Client #1's accounts, Frankel falsely claimed to have already reviewed the transactions in the x4084 account and had found nothing amiss.

47. And third, when Advisory Client's sports agency later flagged the unauthorized ACH transfers in the x4084 as potentially fraudulent, Frankel falsely claimed that a personal assistant of Advisory Client #1 was responsible for the fraudulent AMEX charges.

48. Frankel therefore acted with scienter when engaging in a scheme to

COMPLAINT                                          9

1 defraud by misappropriating advisory client funds, in violation of his fiduciary duty.

2     49.    Frankel also failed to exercise reasonable care. The standard of care of an investment adviser is that of a fiduciary. Frankel owed his advisory clients both a duty of loyalty and a duty of care. Frankel violated his fiduciary duty when misappropriating funds from Advisory Client #1 and Advisory Client #2, and he therefore acted negligently.

### FIRST CLAIM FOR RELIEF
### Fraud by an Investment Adviser
### Violations of Section 206(1) of the Advisers Act

50. The SEC realleges and incorporates by reference paragraphs 1 through 49 above.

51. Frankel is an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). In the relevant period, Frankel was in the business of providing investment advice concerning securities for compensation.

52. In the relevant period, Frankel, knowingly or recklessly, employed a device, scheme, or artifice to defraud his advisory clients.

53. Specifically, Frankel stole and misappropriated funds from two of his advisory clients to pay his personal expenses and for other unauthorized purposes. Frankel further attempted to conceal his fraud. He structured his unauthorized transfers in a manner designed to avoid detection of his fraud. He falsely stated to Advisory Client #1's sports agency that he had reviewed the relevant account activity and found nothing improper. And later, he falsely stated to Advisory Client #1's sports agency that any fraudulent transfers in that account were the responsibility of Advisory Client #1's personal assistant.

54. By engaging in the conduct described above, Frankel, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, employed a device, scheme, or artifice to defraud his advisory clients.

55. By engaging in the conduct described above, Defendant Frankel violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## SECOND CLAIM FOR RELIEF

**Fraud by an Investment Adviser**

**Violations of Section 206(2) of the Advisers Act**

56. The SEC realleges and incorporates by reference paragraphs 1 through 49 above.

57. Frankel is an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). In the relevant period, Frankel was in the business of providing investment advice concerning securities for compensation.

58. In the relevant period, Frankel, negligently and in violation of applicable standards of care including his fiduciary duty as an investment adviser, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon his advisory clients.

59. Specifically, Frankel stole and misappropriated funds from two of his advisory clients to pay his personal expenses and for other unauthorized purposes. Frankel further attempted to conceal his fraud. He structured his unauthorized transfers in a manner designed to avoid detection of his fraud. He falsely stated to Advisory Client #1's sports agency that he had reviewed the relevant account activity and found nothing improper. And later, he falsely stated to Advisory Client #1's sports agency that any fraudulent transfers in that account were the responsibility of Advisory Client #1's personal assistant.

60. By engaging in the conduct described above, Frankel, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, engaged in transactions, practices, or courses of business, which operated as a fraud or deceit upon his advisory clients.

61. By engaging in the conduct described above, Defendant Frankel violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant Frankel committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Frankel and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

### III.

Order Defendant Frankel to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### IV.

Order Defendant Frankel to pay civil penalties under Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 12, 2022

*/s/ Douglas M. Miller*
DOUGLAS M. MILLER
Attorney for Plaintiff
Securities and Exchange Commission